IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. C 11-00099 WHA |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND SETTING STATUS CONFERENCE** |
| LAWRENCE R. GOLDFARB and BAYSTAR CAPITAL MANAGEMENT, | |
| Defendants. | |

Defendants Lawrence Goldfarb and Baystar Capital Management moved to dismiss the criminal charges against them. Defendants claim they substantially complied with their deferred prosecution agreement with the United States such that the United States is contractually barred from resuming the prosecution. For the reasons set forth below, the motion is **DENIED**.

**BACKGROUND**

On March 1, 2011, the United States filed an information charging defendants with wire fraud in violation of 18 U.S.C. 1343. The information alleges that defendants, who managed investments, defrauded investors when they did not disclose distributions and reinvested those distributions in other entities, some of which they owned. That same day, the SEC filed a complaint against defendants alleging similar conduct. *Securities and Exchange Commission v. Lawrence R. Goldfarb and Baystar Capital Management, LLC,* CV-11-0938 WHA (N.D. Cal. 2011). The SEC filed written consents to the proposed entry of judgment signed by Goldfarb on behalf of both defendants. Judgment was entered in the civil case on March 16, 2011.

On March 1, 2011, defendants entered into a deferred prosecution agreement ("DPA") with the United States, wherein the United States agreed to dismiss the criminal charges if the defendants complied with the terms of the DPA. The defendants agreed to: (1) "cooperate fully and in good faith . . . regarding all the facts and circumstances of this case and any other matters arising out of the investigation that led to the instant Information," including meeting with the government and providing documents or records upon request; (2) "pay restitution of $12,112,416 pursuant to the terms of the Judgment in *Securities and Exchange Commission v. Lawrence R. Goldfarb and Baystar Capital Management, LLC,* CV-11-0938 (N.D. Cal. Mar. 1, 2011);" and (3) "be barred for three years from association with any broker, dealer, investment adviser, municipal securities dealer, municipal adviser, transfer agent or nationally recognized statistical organization" (DPA ¶¶ 4-6).

The judgment in the related civil SEC case set a schedule for payment of over $14 million in five installments, with the balance to be paid no later than March 15, 2012. Defendants timely paid three of the payments in the amounts of $30,000, $25,000, and $25,000, plus interest, on March 24, June 14, and December 13, 2011, respectively. Defendants failed to pay the $1,025,000 due on September 15, 2011, or the balance due on March 15, 2012. In June 2012, this Court issued an order finding the defendants in civil contempt for failure to comply with the judgment and appointed a receiver to take control of all of defendants' income and assets. The receiver is to use defendants' assets to pay down the final judgment. Defendants have appealed the contempt order.

On March 13, 2012, counsel for defendants met with the government and the Commission to advise them that defendants would not be able to pay the judgment in cash. At that meeting, defendants offered to assign Mr. Goldfarb's assets to the Commission or the aggrieved investors to satisfy the judgment. The Commission declined.

Pursuant to the procedures set out in the DPA, the government notified defendants that they were in material breach of the DPA by way of a letter dated March 16, 2012. The letter stated, "under the Agreement you now have two weeks in which to make a presentation to demonstrate that no breach has occurred or that the breach was neither knowing nor material or

2

that the breach has been cured." Counsel for defendants then met with the government on March 30 regarding the alleged breach. On April 23, the defendants were arraigned on the information. The government claims that defendants have paid $80,000 toward the SEC judgment but have failed to pay $13,983,094, plus interest.

Defendants argue that they have not materially breached the DPA because they complied with two of the three conditions of the DPA (cooperation and non-association), and have substantially complied with the third condition regarding restitution. They argue that by offering to assign their assets to the Commission to satisfy the judgment, they did not materially breach the agreement. Moreover, they argue that the terms of the DPA regarding performance are ambiguous, such that defendants may pay restitution within three years of entering into the DPA, rather than by the March 2012 date established in the civil case.

## ANALYSIS

### 1. THE DPA'S "SOLE DISCRETION" PROVISION.

Both parties agree that deferred prosecution agreements are similar to plea agreements in that both are considered "contractual in nature and must be measured by contract law standards." *United States v. Sutton*, 794 F.2d 1415, 1423 (9th Cir. 1986). The government states that a plea agreement "generally involves the government agreeing to a particular sentencing framework in return for a defendant admitting to criminal conduct, forgoing constitutional and statutory rights, and submitting to a criminal sentence." In contrast, deferred prosecution agreements are "agreements by the government not to prosecute a potential defendant in return for an admission of conduct and a period in which the potential defendant is subject to certain conditions, such as the payment of restitution or the adherence to a corporate compliance program." Both parties agree that the substantive terms of the DPA should be interpreted based on contract law principles, although they disagree as to the level of deference to be shown to the government. The rationale for applying contract law to plea agreements is premised on "the notion that the negotiated guilty plea represents a bargained-for quid pro quo." *United States v. Escamilla*, 975 F.2d 569, 571 (9th Cir. 1992). Any dispute over the terms of an agreement "will be determined by objective standards." *Sutton*, 794 F.2d at 1423. To determine whether a plea agreement has

3

been breached, a court must consider what the defendant "reasonably understood" when he entered into the agreement. *United States v. Packwood*, 848 F.2d 1009, 1011 (9th Cir. 1988). "Plea agreements implicate important due process rights, however, and so the process must be fair." *Id.* at 1011.

The government argues that the terms of the DPA provide that the government has sole discretion to determine whether defendants committed a knowing and material breach. Citing *United States v. Castaneda*, 162 F.3d 832, 835-6 (5th Cir. 1998), defendants argue that due process prevents the government from unilaterally rescinding an agreement; instead, a criminal defendant must be provided the opportunity to have a court determine whether he or she materially breached the agreement. Neither party has identified any prior decisions, precedential or otherwise, addressing the question of whether a provision in a deferred prosecution agreement or plea agreement providing that the government shall determine breach in its "sole discretion" precludes judicial review of the alleged breach. The Court's own research has similarly yielded no authority.

Prosecutors have discretion in determining whom to prosecute, what charges to file, and whether to engage in plea negotiations. The courts, as a separate branch of government, must generally respect this separation of powers. Moreover, it is well-settled that criminal defendants can waive important rights in non-prosecution or plea agreements. In the case of plea agreements, for example, Federal Rule of Criminal Procedure 11 provides that a defendant may waive the right to appeal or collaterally attack the sentence based on the terms of a plea agreement. Defendants may also waive constitutional rights to a jury trial, to confront and cross-examine witnesses against him, and to claim the Fifth Amendment privilege against self-incrimination. "[S]uch waivers in plea bargaining are now accepted as an 'important component of this country's criminal justice system.'" *United States v. Navarro-Botello*, 912 F.2d 318, 321 (9th Cir. 1990) (internal quotations and citations omitted).

The Court of Appeals for the Ninth Circuit has upheld provisions in plea agreements that give the prosecution the sole discretion to file a motion for downward departure under U.S.S.G. § 5K1.1. *United States v. Quach*, 302 F.3d 1096, 1103 (9th Cir. 2002). Section 5K1.1 provides

4

that a district court may depart downward "upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense[.]" U.S.S.G. § 5K1.1. In *Quach*, the plea agreement provided that the government was required to move for a sentence reduction pursuant to Section 5K1.1 if the defendant cooperated fully and provided substantial assistance. At the time of sentencing — the appropriate time to bring a Section 5K1.1 motion — the government did not move for a sentence reduction. The Court of Appeals found that, because the government had not yet asked the defendant to testify in any proceeding and did not dispute his cooperation, the defendant had not violated the plea agreement. The court remanded for sentencing, holding that because the defendant had not breached the agreement, the government was obligated to determine whether to move for a sentence reduction pursuant to Section 5K1.1. Significantly, the court noted that "pursuant to the plea agreement, the government still retains the 'sole discretion' to decide whether Defendant provided substantial assistance — *so as long as that decision is made in good faith* — and, depending on the nature of the assistance, the extent of any departure from the Sentencing Guidelines range that it would recommend. We do not 'intimate [any] view as to whether a government motion under [ ] § 5K1.1 is or is not in order.'" *Quach*, 302 F.3d at 1103 (internal quotations omitted) (emphasis added). Because the plea agreement's terms specifically provided that the government would retain sole discretion regarding whether to file a motion for downward departure, the court limited its review to determining if the prosecution fulfilled its own promise in good faith.

In this case, defendants, who were represented by counsel, do not allege that they entered into the agreement by mistake or that their agreement to the terms of the DPA and the waivers contained therein was not knowing and voluntary.[1] Nor have they claimed that the provision is

---

[1] In their reply brief, defendants raise for the first time an allegation that, because the Court did not review the DPA with defendants, "there is a question as to whether defendants fully understood the rights that they were purportedly waiving." Our court of appeals has held, however, that "a Rule 11 colloquy . . . is not a prerequisite to a finding that the waiver [of the right to appeal] is valid; rather, a finding that the waiver is knowing and voluntary is sufficient." *United States v. DeSantiago-Martinez*, 38 F.3d 394, 395 (9th Cir. 1992). Even assuming that defendants had a right to judicial review of the government's determination of material breach, defendants' bare assertion — raised for the first time on reply and unsupported by any specific facts or allegations — is insufficient to create a question of fact regarding defendants' knowing and voluntary agreement

5

unconscionable or motivated by improper purpose. The provision regarding determination of material breach was part of the bargained-for quid pro quo of the agreement. Although the government must be held strictly to its promises, if the government fulfilled its promises in good faith, defendants cannot now request that the court rewrite the agreement. *United States v. Read,* 778 F.2d 1437, 1441 (9th Cir. 1985) (government must be held to "the literal terms of the agreement.") Here, the government was obligated to follow specific procedures set forth in the agreement, including providing notice and a period for defendants to make a presentation to the government contesting the breach determination. After defendants had been heard, the government then retained the sole discretion to determine whether the breach occurred and was knowing and material. The government fulfilled the literal requirements of the DPA — which provided for specific processes regarding notice to defendants, a chance to be heard, and a requirement that the government make a determination of knowing and material breach — and may now proceed with prosecution of the defendants.

### 2. DEFENDANTS MATERIALLY BREACHED THE DPA.

Defendants urge the court to apply a standard requiring the government to prove by a preponderance of the evidence that (1) defendants breached the agreement, and (2) the breach is sufficiently material to warrant recision. *See United States v. Castaneda*, 162 F.3d 832, 835-6 (5th Cir. 1998). Even if the Court were to apply the standard of review urged by defendants, defendants' motion would still be denied.

#### A. Defendants paid only a small fraction of the required restitution.

It is undisputed that defendants have not made the required payments as required by the payment schedule in the civil SEC case. Despite having made three timely payments totaling some $80,000, defendants are delinquent on the remainder, on the order of over $13 million. Defendants were also aware that their primary assets were illiquid, and would not likely be immediately available. In spite of this, defendants spent close to $300,000 on personal luxury items between March 1, 2011 and March 15, 2012. Defendants argue that this represents less

---

to the terms of the DPA.

6

than three percent of the amount due, but this misses the point. Contrary to their claim, defendants have not established that they attempted to make the restitution payments in good faith throughout the 12-month payment period.

On the eve of the deadline for full payment, defendants met with the government and the Commission and offered to assign their assets to the Commission or the affected investors. As described by defendants, their most valuable assets are an interest in a real estate fund that defendants have not been able to sell or cash out and a promissory note that is the subject of litigation in state court. Regarding their interest in the real estate fund, defendants state that the only offer they received was for "$7.6 million to be paid over seven years." The Commission rejected defendants' proposal to assign these assets. Defendants argue that nothing in the final judgment in the civil SEC case requires that payment be made in cash. At the hearing, counsel for defendants stated that the government was aware that his assets were illiquid when it entered into the agreement in March 2011. Defendants' intent at the time they entered the agreement with the government was to liquidate the assets, which they attempted to do. Counsel further argued that "good faith" compliance has been demonstrated where defendants have not evaded the judgment by, for example, stashing away assets in trusts or hidden accounts, and have offered to assign their assets to the Commission.

Defendants cannot, however, satisfy their obligation by offering assets of questionable value that are encumbered by various lawsuits, liquidity problems, or other unique and unmanageable issues. The judgment states that defendants "shall pay $14,079,787 in five installments[.]" Whether the term "cash" need be made explicit, at the very least the judgment requires payment of the specified amounts, available at that time. Illiquid assets such as those offered by defendants plainly do not satisfy this requirement.

Defendant argues that breach of this provision does not mean that the DPA itself has been materially breached, as defendants have complied with other provisions of the agreement. This argument does not hold water. The restitution provision is one of only three key promises defendants made pursuant to the DPA. A material breach of this provision is grounds for finding

7

breach of the entire agreement. Similarly, a material breach of their promise to cooperate fully, if properly determined, would also provide grounds for rescinding the DPA.

### B. The terms of the DPA are not ambiguous.

Defendants argue that the terms of the agreement are ambiguous, and that the ambiguities should be resolved in their favor. Specifically, defendants point to paragraph seven of the DPA, which stated: "the duration of this Agreement shall be for thirty-six months running from the date this Agreement is fully executed. Notwithstanding, the defendants agree that they shall not be released from the terms and conditions of this Agreement until they have made all the restitution payments required pursuant to Paragraph 5 and they further agree that any failure to makes such payments according to the terms agreed to by this Office shall constitute a material breach of this Agreement." The term "Office" referred to the United States Attorney's Office for the Northern District of California. Defendants argue that the DPA was ambiguous as to (1) the deadline for payment of restitution, and (2) what constitutes a material breach.

*First,* defendants argue that paragraph 7 is ambiguous because it first refers to the duration of the DPA (thirty-six months), which "suggests that the time to make the restitution payment is not limited to one year from the entry of the Judgment or March 15, 2012, but rather could be thirty-six months, or perhaps even longer." Paragraph 7 could thus be read to mean that defendants are obligated to pay the total amount of restitution set forth in paragraph 5 of the DPA, which refers to the judgment in the civil SEC case, but that they have thirty-six months to do so. *Second*, defendants argue that because paragraph 7 referred to "the terms agreed to by this Office" rather than referring to "the judgment" or setting its own payment schedule, one could read it to mean that failure to pay restitution by March 15, 2012 cannot constitute a material breach, since "the terms agreed to by this Office" may be referencing some other, unstated agreement.

To determine the disputed terms of the agreement, the court must apply "objective standards" and consider "what the defendant reasonably understood" when he entered into the agreement. *Packwood*, 848 F.2d at 1011. Although a court must hold the government to the literal terms of its agreement and strictly enforce its promises, the terms of the contract must be

interpreted based on objective standards and basic principles of contract interpretation. This requires construing the contract to give effect to the mutual intention of the parties as it existed at the time of the execution of the contract. *Pac. Portland Cement Co. v. Food Mach. & Chem. Corp.*, 178 F.2d 541, 552 (9th Cir. 1949). The government is correct that the language of paragraph 7 is not ambiguous. It does not suggest that there is any other agreement that is referred to by "the terms agreed to by this Office." At the time the parties entered into the DPA, the SEC judgment was still pending and the proposed terms had yet to be approved by the Court. Nonetheless, it is clear that defendants must make payments as "required pursuant to paragraph 5," which incorporated the terms entered in the SEC judgment, including the payment schedule. Moreover, defendants do not argue that there is any agreement for scheduling payments other than the terms set forth in paragraph 5. Their convoluted argument that paragraph 7 allows for payment within thirty-six months rather than by the time period set by the SEC judgment is contrary to the plain language of the contract.

### C. Harm to the government.

Defendants argue that the United States is not harmed by the non-payment of restitution because defendants must pay additional interest to compensate for any delay and because a receiver has been appointed to take over their assets. Defendants have pointed to no controlling authority that requires this Court to consider whether the government has suffered harm to determine that a breach is material. Under the standard urged by defendants, a party must show that any noncompliance is "innocent, does not thwart the purpose of the bargain, and is wholly dwarfed by that party's performance." *Castenada*, 162 F.3d at 838. As stated above, defendants have not shown that their non-compliance is innocent or that their performance greatly outweighs their non-performance. The government has not received the benefit of its bargain, which was premised on defendants' speedy disgorgement of millions of dollars. Defendants have not paid significant sums and, as they point out, their assets are now being administered by a receiver. Defendants have not established a good reason for the failure to liquidate their assets and make a good faith effort to pay the restitution during the 12-month period set forth in the civil judgment. As such, their compliance with the terms of the DPA cannot be considered

9

"innocent" or substantial. The Court notes that no contention is made that allowing the government to proceed with this prosecution would somehow unwind the judgment in the civil SEC case.

For the forgoing reasons, defendants' motion is **DENIED**. A further status conference is set for **SEPTEMBER 18, 2012 AT 2 P.M**.

**IT IS SO ORDERED.**

Dated: September 5, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE